1   **ANDERSON & KARRENBERG**
    JASON E. GREENE (Utah State Bar No. 13990)
2   50 West Broadway, Suite 700
3   Salt Lake City, UT 84101
    Telephone: (801) 534-1700
4   Facsimile: (801) 364-7697

5   **GUTRIDE SAFIER LLP**
    SETH A. SAFIER (Pro hac vice forthcoming)
6   HAYLEY REYNOLDS (Pro hac vice forthcoming)
7   100 Pine Street, Suite 1250
    San Francisco, CA 94111
8   Telephone: (415) 639-9090
    Facsimile:  (415) 449-6469
9
    MATT MCCRARY (Pro hac vice forthcoming)
10  4450 Arapahoe Ave., Suite 100
11  Boulder, CO 80303

12  Attorneys for Plaintiffs

13                     UNITED STATES DISTRICT COURT FOR THE

14                              DISTRICT OF UTAH

15
    | ALEX HINKLEY, MEGAN TAYLOR, and | CASE NO. |
16  | SHIELA CRAWFORD as an individuals, on be- | |
    | half of themselves, the general public and those | **CLASS ACTION COMPLAINT FOR** |
17  | similarly situated, | **VIOLATIONS OF THE CONSUMER** |
    | | **PROTECTION STATUTES OF ILLI-** |
18  | Plaintiffs, | **NOIS, FLORIDA, AND NEW YORK** |
19  | | |
    | | **JURY TRIAL DEMANDED** |
20  | v. | |
21  | BAKER MILLS, INC.; and KODIAK CAKES, | |
    | LLC, | |
22  | | |
23  | Defendants. | |

24

25

26

27

28

-1-

Class Action Complaint

### INTRODUCTION

1.    Plaintiffs Megan Taylor, Alex Hinkley and Sheila Crawford by and through their counsel, bring this class action against Defendants Baker Mills, Inc. and Kodiak Cakes, LLC, to seek redress for Defendants' deceptive practices in labeling and marketing their Kodiak Cakes products.

2.    Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein to support weight loss, exercise, and general fitness, among other perceived health benefits of protein consumption.

3.    To capitalize on this trend, Defendants prominently label their Kodiak Cakes products as providing specific amounts of protein per serving depending on the product, such as "14g protein" on the label of its Buttermilk Flapjack and Waffle Mix. Consumers, in turn, reasonably expect that each product will provide the actual amount of protein per serving that the label claims it will.

4.    In truth, however, Defendants' products do not deliver the amount of protein that the labels claim. Based on amino acid content testing, Defendants' products contain approximately 17% less protein than claimed, meaning, for example, rather than having 14 grams of protein per serving, Defendants' Buttermilk Flapjack and Waffle Mix product actually has only 11.5 grams.

5.    Further, Defendants use proteins of low biological value to humans in their products, such as pea protein and wheat protein. Accordingly, when the amino acid content is adjusted for protein digestibility (the "Protein Digestibility Corrected Amino Acid Score", or "PDCAAS"), Defendants' products will provide even less protein per serving than amino acid content testing alone reveals. Wheat and pea protein typically have PDCAAS scores of between 0.3 and 0.4.

6.    Defendants' products are also misbranded. Parallel state and federal regulations require any product that makes a protein claim to include in the nutrition facts panel the percentage of the daily value of the protein in the product based on its amino acid content and PDCAAS. Defendants' products prominently make protein content claims but fail to provide the

required percent daily value of protein in the nutrition facts panel.

7.     Defendants' misrepresentations and misbranding caused Plaintiffs and members of the class to pay a price premium for the products.

**PARTIES**

8.     Megan Taylor ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Grayslake, Illinois.

9.     Alex Hinkley ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Spencerport, New York.

10.    Sheila Crawford ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Lutz, Florida.

11.    Defendant Baker Mills, Inc. is a corporation existing under the laws of the State of Utah, having its principal place of business in Utah.

12.    Defendant Kodiak Cakes, LLC is a limited liability company existing under the laws of the State of Delaware, having its principal place of business in Utah.

13.    Baker Mills, Inc., and Kodiak Cakes, LLC are collectively referred to hereafter as "Defendants."

**JURISDICTION AND VENUE**

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and at least one Defendant are citizens of different states.

15.    This Court has personal jurisdiction over Plaintiffs because they each submit to this Court's jurisdiction.

16.    This Court has general personal jurisdiction over Defendants because they conduct substantial business in this District and have sufficient minimum contacts with the State of Utah. Specifically, Defendants maintain their corporate headquarters in Park City, Utah.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of Utah, including within this District.

18.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

19.     Defendants manufacture, distribute, market, advertise, and sell a variety of breakfast and snack products in the United States under the brand name "Kodiak Cakes."  Many of these products have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that the products contain and provide a certain amount of protein per serving. Plaintiffs have attached, as Exhibit A, a list of the products of which they are aware that make protein claims on the labels.  The products listed in Exhibit A, and any other Kodiak Cakes brand product that claims a specific amount of protein on its label, will hereinafter be referred to as "Products."

20.     The representation that the Products contain and provide a specific amount of protein per serving respectively, was uniformly communicated to Plaintiffs and every other person who purchased any of the Products in Illinois, New York, Florida and the United States. The same or substantially similar product label has appeared on each respective product during the



entirety of the Class Period in the general form of the following example:

21.    The nutrition facts panel on the side of the Products likewise repeats the protein content claims, although it fails to provide any referenced percent daily value of its protein content as state and federal regulations require. The side panel of the Products has appeared consistently throughout the Class Period in the general form of the following example:



22.    As described in detail below, Defendants' advertising and labeling of the Products as containing and providing specific amounts of protein per serving is false, misleading, and intended to induce consumers to purchase the Products at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that a serving of the Product will provide the grams of protein as represented on the

label, when in fact, protein content testing reveals that a serving contains approximately 17% fewer grams of protein than claimed. Further, when correcting for the digestibility (and therefore usability) of the protein through the PDCAAS, the amount provided will be even less.

**Consumer Demand for Protein**

23.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. This is especially true in the community of athletes, registered dietitians, and coaches, to which Defendants market. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[1]

24.     Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academy of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

25.     Athletes and fitness enthusiasts typically consume much higher amounts of protein each day; typically between 1 to 1.5 grams of protein for every pound of body weight.

26.     The health benefits of protein are just as important, if not more important, for children. Children are in a relative state of constant growth and rely on protein as the building block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academies of Science recommends the following amounts of daily intake of protein based on age group: 1-3

---

[1] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf
[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*

years old: 13 g of protein per day; 4-8 years old: 19 g of protein per day; 9-13 years old: 34 g of protein per day.[3]

27.    Athletes, dieticians, and coaches are particularly concerned about incorporating protein into their diets both pre and post workout. Protein is the building block of muscles. There-fore, consumers trying to gain muscle seek to ensure their protein intake is sufficiently high to promote muscle growth and prevent muscle loss. Many studies report that consuming protein af-ter exercise can aid recovery by reducing muscle damage and improving muscle performance.

28.    The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases.

29.    Proteins are not a monolithic substance, but instead come in many varieties. Pro-teins are essentially chains of different amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the pro-tein that is ingested changes the function of the protein in the body, and certain types of proteins are more easily digested and used by humans than others.

30.    Defendants use both whey protein and plant-based proteins in their products. De-fendants claim "We use a variety of protein sources in our products to help you meet your indi-vidual requirements. Whole grain oats and wheat both have protein in them naturally. Our primary source of added protein is whey protein, wheat protein, and milk protein. Other second-ary sources come from egg and pea proteins."

31.    Typically, a "complete protein" is a protein that contains all nine essential amino acids. An essential amino acid is one that the human body cannot produce on its own and must be obtained through diet. Essential amino acids may be measured by the Protein Digestibility Cor-rected Amino Acid Score ("PDCAAS"), which FDA regulations require for the calculation of Daily Reference Values ("DRV"). 21 C.F.R. § 101.9(c)(7)(ii); FDA Food Labeling Guide, p.29, Question N. 22.

---

[3] *Id.*

32.     The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then multiply that number by humans' ability to digest the amino acid profile (the "PDCAAS").

33.     Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Whey protein is animal-based and contains all nine essential amino acids. It has a high biological value and is fully digestible by humans. Thus, whey protein has a PDCAAS of 1.0. Plant protein contains higher levels of antioxidants, but rarely contains all nine essential amino acids.  Further, plant proteins such as wheat and pea proteins, which Defendants use in their Products according to their ingredient lists, are not fully digested by humans. Wheat and pea proteins typically have a PDCAAS of .3-.4, meaning only 30-40% of the protein from those sources will be digested and available to humans.

34.     By combining proteins with a 1.0 PDCAAS, such as whey, with lower quality proteins such as wheat and pea that typically have .3 or .4 PDCAAS, the overall PDCAAS for the combination will be far lower than 1.0.

35.     Accordingly, Defendants' use of low quality proteins, even in combination with some higher quality proteins, means that they actually provide far less protein to humans than their labels claim, or that amino acid content testing without correcting for digestibility shows.

**Federal and State Regulations Governing Food Labeling**

36.     The Food and Drug Administration regulates nutrition content labeling. According to these regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . *shall be given if a protein claim is made for the product . . .*" 21 C.F.R. 101.9(c)(7)(i) (emphasis added).

37. Although FDA guidance provides that a declaration of the DRV for protein is "not mandatory" in typical circumstances, that same guidance is equally clear that "[t]he percent of the DRV is required if a protein claim is made for the product."[4]

38. Further, FDA regulations require the DRV to be calculated using amino acid analysis, more specifically the Protein Digestibility Corrected Amino Acid Score ("PDCAAS"). 21 C.F.R. § 101.9(c)(7)(ii); FDA Food Labeling Guide, p. 29, Question N.22. The PDCAAS method does not calculate protein content by nitrogen combustion, which is otherwise permitted under 21 C.F.R. § 101.9(c)(7) for products that do not make protein content claims.[5] Nitrogen combustion is a less accurate testing methodology for determining protein content than amino acid analysis. It typically overstates total protein content and has no ability to account for digestibility and protein quality.

39. Accordingly, when a product makes a protein content claim, FDA regulations require manufacturers to calculate the amount of amino acids that the food contains and then multiply that amount by humans' ability to digest the amino acid profile (the PDCAAS) to come up with a percent daily value.

40. The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

41. Under the FDCA, the term false has its usual meaning of "untruthful," while the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

---

[4] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed February 18, 2020).
[5] Specifically, the regulation states that the grams of protein figure in the nutrition fact box "may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food."

42.     Representing that the Products contain a certain amount of protein per serving as Defendants' labels do is a statement of fact, and use of these phrases on the labels of packaged food is limited by the aforementioned misbranding laws and regulations.

**Defendants' Marketing and Labeling of its Products Violates Federal Food Labeling Laws**

43.     Defendants' Products are unlawful and misbranded because the Products' labels state that each Product contains and provides a specific amount of protein per serving—such as "14g protein" for the Buttermilk Flapjack and Waffle Mix—when, in fact, amino acid content testing reveals that the Products contains approximately 17% fewer grams of protein than claimed.

44.     Further, Defendants make protein content claims on the front of their packages and yet have left the Percent Daily Value column of its nutrition facts for protein completely blank. Because Defendants made a protein content claim, they were statutorily obligated to calculate the protein content of their products via the amino analysis described above and to provide a percent daily value figure using the PDCAAS method described above. Defendants have failed to do so, and their Products are accordingly misbranded.

45.     Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9 (c)(7) by failing to include on their product labels the nutritional information required by law.

46.     A reasonable consumer would expect that the Products contain and provide what Defendants identify them to contain and provide on the product labels and that the labels would not be contrary to the policies or regulations of the FDA. For example, a reasonable consumer would expect that when Defendants label their Products as containing "14g Protein" per serving, the Products would provide 14 grams of protein per serving. However, based on amino acid content testing conducted by Plaintiffs' counsel, Defendants' Products contain approximately 17% less protein per serving than claimed.

47.     Moreover, based on the types of protein stated in the Products' ingredient lists, the amount of digestible or usable protein the Products actually deliver to the human body is even lower than the amino content testing itself reveals. Defendants use poor quality proteins, such as

wheat and pea proteins, in their Products, which will result in each product's overall PDCAAS being far less than 1.0.

48.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendants' food labeling claims, especially at the point of sale. Consumers would not know the true protein content of the Products merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not contain the number of grams that is represented on the label, and instead contains 17% fewer grams. An average consumer also lacks the specialized knowledge necessary to determine the PDCAAS for the Products. That combined with Defendants' active concealment in representing that the Products contain and provide specific amounts of protein per serving, and not disclosing otherwise anywhere on the label, much less by listing the Protein DRV as it is required to do, gave the average reasonable consumer no reason to suspect that Defendants' representations on the packages were not true. Therefore, consumers had no reason to investigate whether the Products actually do contain and provide the amount of protein per serving that the labels claim they do. Thus, reasonable consumers relied on Defendants' representations regarding the nature of the Products.

49.     Defendants intend and know that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the claim that their Kodiak Cakes Products contain and provide specific amounts of protein per serving.

**Defendants' Website and Other Marketing Confirms That Defendants Intend to Deceive Consumers**

50.     Defendants' own advertising and marketing materials show that Defendants intended to deceive consumers into believing the false and deceptive packaging of the Products.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51.      For example, Defendants' website located at https://www.kodiakcakes.com ("Defendants' website") claims that its Products are "Protein Packed." Defendants' website encourages consumers to buy their Products, which they describe as "giv[ing] you the fuel to sustain you all day long."

52.      The "Our Mission" page of Defendants' website explains that their Products con-



tain protein because protein "plays an important part in our everyday lives, from powering us through big adventures to keeping us full and energized during busy days," and is "a key factor in muscle recovery after a tough workout." It goes on to boast "Combining the nourishment of whole grains with the benefits of high-quality protein just makes sense, so we add high-quality protein to many of our products and give you the option to add even more to your diet by using milk and an egg. Plus, you won't have to suffer through another chalky protein breakfast shake again. You're welcome." A screenshot of Defendants' "Our Mission" page appears below:

53.      Defendants' website encourages consumers to use their Products in baking anything from Fish and Chips to Strawberry Chocolate Chip Cupcakes to Cake Batter Blondies ("[Y]ou don't have to feel too guilty about having two, or three!"), claiming "The goodness doesn't stop at breakfast. Check out these versatile, delicious recipes that can transform your

favorite Kodiak Cakes mix into something completely unexpected." By promoting the use of its Products in baking foods, Defendants intend to lead consumers to believe that the foods that otherwise lack nutritional value can now be a source of healthy nutrients.

54.     In short, Defendants' advertising and marketing campaign confirms that Defendants intend that consumers be effectively deceived by Defendants' misrepresentations on the Products' labels. More specifically, Defendants intend that consumers who read the Products' labels believe that the Products contain the number of grams of protein listed on the front of the label.

**Defendants Misleadingly Market Their Products to Increase Profits and Gain a Competitive Edge**

55.     Defendants' website explains their perceived competitive advantage, stating: "Whether you're training for your first half-marathon, prepping for a big day on the trail, or just adopting a healthier diet, the need for real, nourishing food remains the same. We've taken care to craft our foods with the wholesome nutrients, freshly ground whole grains, and essential protein you need to conquer your frontier."

56.     In making false, misleading, and deceptive representations, Defendants distinguish their Products from competitors' products. Defendants knew and intended that consumers would purchase, and pay a premium for, protein products labeled as having more protein than the Products actually contain over comparable protein sources that do not contain misleading representations on the product labels. For example, Defendants' website states, "[r]esearch . . . shows that consuming whey protein in combination with carbohydrates post-workout is an excellent way to stimulate muscle growth, recovery, and reduce muscle soreness. For this reason, Kodiak Cakes are a perfect pre or post-workout breakfast option for athletes. Our Kodiak Cakes cups are a great on-the-go breakfast or snack athletes can throw in their gym bag before playing in a game or tournament." By using this branding and marketing strategy, Defendants are stating that their Products are superior to, better than, and more nutritious and healthful than other forms of protein products that do not misrepresent the number of grams of protein on their labels.

**Defendants Intend to Continue to Market their Products as Containing More Protein than the Products Actually Contain**

57.     Because consumers pay a price premium for protein supplement products that contain more protein, by labeling their Products as containing more grams of protein per serving than they actually contain, Defendants are able to both increase their sales and retain more profits.

58.     Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales of their Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in their products, and/or (ii) commanding a higher price for their Products because consumers will pay more for these Products due to consumers' demand for products containing more protein.

59.     The market for protein products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the number of grams of protein in their Products, Defendants have an incentive to continue to make such false representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

60.     For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[6]

61.     To capitalize on the growing market, since 2014, Defendants have expanded their product line from Kodiak Cakes mixes, to frozen waffles, baking mixes, oatmeal, granola, and snacks and have continued to replicate their misrepresentations on the new product lines. Defendants' co-founder has stated regarding the company's focus on protein, "One success factor is sticking to your position. It was taking a long time to get Kodiak Cakes to where we wanted, and we did wonder if we should do a white flour pancake mix. I formulated a really good white flour mix, but the best thing we ever did was not launch it. We're all about the whole grain and protein."[7] Defendants continue to launch new product lines and flavors to diversify their portfolio to maintain their competitive edge, making it likely that Defendants will continue to misleadingly

---

[6] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

[7] Stephen Daniells, *Kodiak Cakes' CEO: "We're Growing 80% Year-on-Year and Approaching $100 Million,"* FOOD NAVIGATOR USA, Jan. 24, 2018, https://www.foodnavigator-usa.com/Article/2018/01/24/Kodiak-Cakes-CEO-We-re-growing-80-year-on-year-and-approaching-100-million.

advertise their Products and perpetuate the misrepresentations regarding the protein in its Products.

## **PLAINTIFFS' EXPERIENCES**

### **Megan Taylor**

62.     Plaintiff Taylor has purchased Kodiak Cakes products during the Class Period, including at Target and Jewel Osco in and around Grayslake, Illinois.  The products she purchased included Frozen Waffles (Buttermilk, Cinnamon, Chocolate Chip, and Blueberry flavors); Frozen Flapjacks (Buttermilk flavor); Flapjack Mix (Buttermilk, Peanut Butter, and Chocolate Chip flavors); Muffin Mix (Blueberry Lemon and Dark Chocolate Flavors); and Flapjack Cups (Buttermilk and Maple, and Blueberry and Maple flavors).

63.     Plaintiff Taylor made each of her purchases after reading and relying on the truthfulness of Defendants' product label that promised the Products provided the number of grams on the label. For example, she purchased the Buttermilk and Maple cup relying on the representation of "10g Protein" per serving, and she purchased the Blueberry Lemon muffin mix relying on the representation of "15g Protein as prepared."  She relied on the protein representation for each product that she purchased and purchased each product because of the protein representations. But on each of the Products she purchased, Defendants misrepresented the protein contents of the Products as containing 17% more grams of protein than they actually contain, and as far more than they actually provide, when adjusted by the PDCAAS.

64.     At the time of each of her purchases of the Products, Plaintiff Taylor did not know that the Products did not contain or provide the amount of protein represented on the label. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to Plaintiff.

65.     Plaintiff Taylor not only purchased the Products because the labels said that they contained for example, "15g Protein as prepared," "14g Protein," and "12g Protein" per serving, but she also paid more money for the Products than she would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

66.     Had Defendants not misrepresented (by omission and commission) the true nature of the Products, Plaintiff would not have purchased them or, at a very minimum, she would have paid less for the Products.

67.     Plaintiff Taylor continues to desire to purchase protein products, including those marketed and sold by Defendants. If Defendants' Products were reformulated to provide the grams of protein that are represented on the labels, Plaintiff Taylor would likely purchase Defendants' Products again in the future. Plaintiff Taylor regularly visits stores where Defendants' Products and other protein products are sold. Because Plaintiff does not know the formula for Defendants' products and cannot test whether or not the Products provide the amount of protein that is represented on the label, Plaintiff will be unable to rely on Defendants' labels when shopping for protein products in the future absent an injunction that prohibits Defendants from labeling their products with the incorrect number of grams of protein that each serving contains. Should Defendants begin to market and sell a new line of products, Plaintiff could be at risk for buying another one of Defendants' products in reliance on the same or similar misrepresentation.

68.     Plaintiff Taylor and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under Illinois law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

**Alex Hinkley**

69.     Plaintiff Hinkley purchased Kodiak Cakes flapjack and waffle mixes in both Buttermilk and Dark Chocolate flavors from Tops Friendly Market in Buffalo, New York from 2019 to February 2021.

70.     Plaintiff Hinkley made each of his purchases after reading and relying on the truthfulness of Defendants' product label that promised the Products contained "14g Protein" per serving of the Dark Chocolate and Buttermilk flapjack mixes. He purchased the products because of the protein representations. But on each of the Products he purchased, Defendants misrepresented

the protein contents of the Products as containing 17% more grams of protein than they actually contain, and as far more than they actually provide, when adjusted by the PDCAAS.

71.    At the time of each of his purchases of the Products, Plaintiff Hinkley did not know that the Products did not contain or provide the amount of protein represented on the label. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to Plaintiff.

72.    Plaintiff Hinkley not only purchased the Products because the labels said that they contained "14g Protein" per serving respectively, but he also paid more money for the Products than he would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

73.    Had Defendants not misrepresented (by omission and commission) the true nature of the Products, Plaintiff would not have purchased them or, at a very minimum, he would have paid less for the Products.

74.    Plaintiff Hinkley continues to desire to purchase protein products, including those marketed and sold by Defendants. If Defendants' Products were reformulated to provide the grams of protein that are represented on the labels, Plaintiff Hinkley would likely purchase Defendants' Products again in the future. Plaintiff Hinkley regularly visits stores where Defendants' Products and other protein products are sold. Because Plaintiff does not know the formula for Defendants' products and cannot test whether or not the Products provide the amount of protein that is represented on the label, Plaintiff will be unable to rely on Defendants' labels when shopping for protein products in the future absent an injunction that prohibits Defendants from labeling their products with the incorrect number of grams of protein that each serving contains. Should Defendants begin to market and sell a new line of products, Plaintiff could be at risk for buying another one of Defendants' products in reliance on the same or similar misrepresentation.

75.    Plaintiff Hinkley and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of

the Class did not receive what they reasonably intended to receive.

**Sheila Crawford**

76.     Plaintiff Crawford purchased Kodiak Cakes Buttermilk flapjack and waffle mix at Publix in Tampa, Florida between September 2020 to February 2021.

77.     Plaintiff Crawford made each of her purchases after reading and relying on the truthfulness of Defendants' product label that promised the Products contained "14g Protein" per serving of the Buttermilk flapjack mix. She purchased the products because of the protein representations. But on each of the Products she purchased, Defendants misrepresented the protein contents of the Products as containing 17% more grams of protein than they actually contain, and as far more than they actually provide, when adjusted by the PDCAAS.

78.     At the time of each of her purchases of the Products, Plaintiff Crawford did not know that the Products did not contain or provide the amount of protein represented on the label. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to Plaintiff.

79.     Plaintiff Crawford not only purchased the Products because the labels said that they contained "14g Protein" per serving respectively, but she also paid more money for the Products than she would have paid for other or a similar protein product that was not mislabeled regarding the number of grams of protein it contained.

80.     Had Defendants not misrepresented (by omission and commission) the true nature of the Products, Plaintiff would not have purchased them or, at a very minimum, she would have paid less for the Products.

81.     Plaintiff Crawford continues to desire to purchase protein products, including those marketed and sold by Defendants. If Defendants' Products were reformulated to provide the grams of protein that are represented on the labels, Plaintiff Crawford would likely purchase Defendants' Products again in the future. Plaintiff Crawford regularly visits stores where Defendants' Products and other protein products are sold. Because Plaintiff does not know the formula for Defendants' products and cannot test whether or not the Products provide the amount of protein that is represented on the label, Plaintiff will be unable to rely on Defendants' labels

when shopping for protein products in the future absent an injunction that prohibits Defendants from labeling their products with the incorrect number of grams of protein that each serving contains. Should Defendants begin to market and sell a new line of products, Plaintiff could be at risk for buying another one of Defendants' products in reliance on the same or similar misrepresentation.

82.     Plaintiff Crawford and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under Florida law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

## CLASS ALLEGATIONS

83.     Plaintiffs bring this class action lawsuit on behalf of themselves and proposed classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

49-state class: All persons in the each state except California who purchased the Products between April 13, 2017 and the present.

New York Class: All persons in New York who purchased the Products between April 13, 2018 and the present.

Florida Class: All persons in Florida who purchased the Products between April 13, 2017 and the present.

Illinois Class:  All persons in Illinois who purchased the Products between April 13, 2018 and the present.

84.     This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

85.     Numerosity: Plaintiffs do not know the exact size of the Class, but they estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action

rather than in individual actions will benefit the parties and the courts.

86.     Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.   The true nature of the protein content in the Products;

b.   Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful because of misrepresentations;

c.   Whether Defendants' actions violate Federal and state laws invoked herein;

d.   Whether labeling the Products as containing more grams of protein than they actually contain causes the Products to command a price premium in the market as compared with similar products that do not make such misrepresentations;

e.   Whether Defendants' advertising and marketing regarding the Products sold to the class members was likely to deceive reasonable consumers;

f.   Whether representations regarding the number of grams of protein in the Products are material to a reasonable consumer;

g.   Whether Defendants engaged in the behavior knowingly, recklessly, or negligently;

h.   The amount of profits and revenues earned by Defendants as a result of the conduct;

i.   Whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j.   Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so,

1        what is the nature of such relief.

2        87.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the

3   Class because, among other things, all such claims arise out of the same wrongful course of

4   conduct engaged in by Defendant in violation of law as complained of herein. Further, the

5   damages of each member of the Class were caused directly by Defendants' wrongful conduct in

6   violation of the law as alleged herein.

7        88.    Adequacy of Representation: Plaintiffs will fairly and adequately protect the

8   interests of all class members because it is in their best interests to prosecute the claims alleged

9   herein to obtain full compensation due to them for the unfair and illegal conduct of which they

10  complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests

11  of class members. Plaintiffs have retained highly competent and experienced class action

12  attorneys to represent their interests and that of the class. By prevailing on their own claims,

13  Plaintiffs will establish Defendants' liability to all class members. Plaintiffs and their counsel

14  have the necessary financial resources to adequately and vigorously litigate this class action, and

15  Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are

16  determined to diligently discharge those duties by vigorously seeking the maximum possible

17  recovery for class members.

18       89.    Superiority: There is no plain, speedy, or adequate remedy other than by

19  maintenance of this class action. The prosecution of individual remedies by members of the

20  classes will tend to establish inconsistent standards of conduct for Defendants and result in the

21  impairment of class members' rights and the disposition of their interests through actions to

22  which they were not parties. Class action treatment will permit a large number of similarly

23  situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

24  and without the unnecessary duplication of effort and expense that numerous individual actions

25  would engender. Furthermore, as the damages suffered by each individual member of the classes

26  may be relatively small, the expenses and burden of individual litigation would make it difficult

27  or impossible for individual members of the class to redress the wrongs done to them, while an

28  important public interest will be served by addressing the matter as a class action.

90.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION
**Violation of New York General Business Law § 349 (Deceptive Acts and Practices)
(Brought on behalf of Plaintiff Hinkley and the New York Class)**

91.     Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

92.     Plaintiff Hinkley brings this claim individually and on behalf of the other members of the New York Class. New York General Business Law § 349 ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

93.     As fully alleged above, throughout the Class Period, by advertising, marketing, distributing, and/or selling the Products with claims that the Products provide more grams of protein than they actually do to Plaintiffs and other Class members, Defendants engaged in, and continue to engage in, deceptive acts and practices because the Products in fact provide fewer grams of protein than the label states.

94.     Plaintiffs and other Class members seek to enjoin such unlawful, deceptive acts and practices as described above.  Each of the Class members will be irreparably harmed unless the unlawful, deceptive actions of Defendant are enjoined in that Defendants will continue to falsely and misleadingly advertise the Products as providing more protein than they actually do.

95.     Plaintiffs believed Defendants' representations that the Products would provide the number of grams of protein as labeled.  Plaintiffs would not have purchased the Products, or

would have paid less for the Products had they known the Products provided fewer grams of protein.

96.    Plaintiffs were injured in fact and lost money as a result of Defendants' conduct of improperly labeling the Products regarding protein content. Plaintiffs paid for 25-50% more protein than the Products actually provide, and therefore the Products they received were worth less than the Products for which they paid.

97.    Plaintiffs and Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendants from continuing to disseminate their false and misleading statements, and other relief allowable under GBL § 349.

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**Violation of New York Business Law § 350 (False Advertising)**
**(Brought On Behalf of Plaintiff Hinkley and the New York Class)**

98.    Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

99.    Plaintiff Hinkley brings this claim individually and on behalf of the other members of the New York Class.

100.    New York Business Law § 350 ("GBL § 350") makes "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York unlawful. GBL § 350 defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity...if such advertising is misleading in a material respect."

101.    Throughout the Class Period, by advertising, marketing, distributing, and/or selling the Products with claims that they provided more protein than they actually did to Plaintiffs and Class members, Defendants violated GBL § 350 and continue to violate GBL § 350 by engaging in false advertising concerning the grams of protein the Products provide.

102.    Plaintiffs and other Class members seek to enjoin such unlawful acts and practices as described above.  Each of the Class members will be irreparably harmed unless the unlawful actions of Defendants are enjoined in that Plaintiffs will continue to be unable to reply on

Defendants' representations that the Products provide the amount of protein that is stated on the Product labels.

103.    Plaintiffs believed Defendants' representations that the Products would provide the number of grams of protein as labeled.  Plaintiffs would not have purchased the Products, or would have paid less for the Products had they known the Products provided fewer grams of protein.

104.    Plaintiffs were injured in fact and lost money as a result of Defendants' conduct of improperly labeling the Products regarding protein content. Plaintiffs paid for 25-50% more protein than the Products actually provide, and therefore the Products they received were worth less than the Products for which they paid.

105.    Plaintiffs and Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendants from continuing to disseminate their false and misleading statements, and other relief allowable under GBL § 350.

**PLAINTIFFS' THIRD CAUSE OF ACTION**
**Violation of the Florida Deceptive and Unfair Trade Practices Act § 501.201 et seq.**
**(Brought on behalf of Plaintiff Crawford and the Florida Class)**

106.    Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

107.    Plaintiff Crawford brings this claim individually and on behalf of the other members of the Florida Class.

108.    Section 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") makes "unfair or deceptive acts or practices in the conduct of any trade or commerce" in Florida unlawful.

109.    As fully alleged above, throughout the Class Period, by advertising, marketing, distributing, and/or selling the Products with claims that the Products provide more grams of protein than they actually do to Plaintiffs and other Class members, Defendants violated the FDUTPA by engaging in, and continuing to engage in, false advertising concerning the grams of protein the Products provide.

110.    Plaintiffs and other Class members seek to enjoin such unlawful acts and practices as described above.  Each of the Class members will be irreparably harmed unless the unlawful actions of Defendants are enjoined in that Plaintiffs will continue to be unable to reply on Defendants' representations that the Product provide the amount of protein that is stated on the Product labels.

111.    Plaintiffs believed Defendants' representations that the Products would provide the number of grams of protein as labeled.  Plaintiffs would not have purchased the Products, or would have paid less for the Products had they known the Products provided fewer grams of protein.

112.    Plaintiffs were injured in fact and lost money as a result of Defendants' conduct of improperly labeling the Products regarding protein content. Plaintiffs paid for 25-50% more protein than the Products actually provide, and therefore the Products they received were worth less than the Products for which they paid.

113.    Plaintiffs and Class Members seek declaratory relief, enjoining Defendants from continuing to disseminate their false and misleading statements, and other relief allowable under the FDUTPA.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**(Brought On behalf of Plaintiff Taylor and the Illinois Class)**

114.    Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

115.    Plaintiff Taylor brings this action individually and on behalf of the Illinois Class.

116.    The Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, et seq., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

117.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

118.    Defendants engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendants as set forth above concerning the grams of protein the Products provide, which has caused damage and injury to Plaintiffs and the Class members. Plaintiff and Class members were injured by Defendants' unfair and deceptive conduct at the time of purchasing Defendants' Products.

119.    Defendant represented, directly or indirectly, that its Products provide a certain number of grams of protein, when in reality, they provide far fewer grams as alleged herein.

120.    Defendant knew or should have known that its protein representations were false and misleading.

121.    Defendants' deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

122.    Defendants' deceptive acts proximately caused actual injury and damage to Plaintiff and the Class members at the point of purchase.

123.    Plaintiff and Class members would not have purchased, or would have paid less for, Defendants' Products but for Defendants' material misrepresentations as described in this Complaint.  Defendant intended Plaintiff and all Class members to rely on their deceptive acts when purchasing Defendants' Products.

**PLAINTIFFS' FIFTH CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(Brought On behalf of Plaintiff Taylor and the Illinois class)**

124.    Plaintiffs incorporate the above paragraphs by reference as though fully set forth herein.

125.    Plaintiff Taylor brings this action individually and on behalf of the Illinois Class.

126.    In Illinois, the Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'"

127.    Plaintiff and the Class members were injured by Defendants' deceptive misrepresentations and these misrepresentations were material and deceived Plaintiff and the Class.  Because Plaintiff and Class members relied on Defendants' misrepresentations, concealments and omissions when purchasing Defendants' Products, they were injured at the time of purchase.

128.    Defendants do business in Illinois, sell and distribute its Products in Illinois, and engaged in and continue to engage in deceptive acts and practices in connections with the sale of their Products in Illinois and elsewhere in the United States.

129.    The Products purchased by Plaintiffs and the Class members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

130.    Defendant engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Defendant as set forth above concerning its Products, which has caused damage and injury to Plaintiff and Class members at the time of purchase.

131.    Defendant represented, directly or indirectly, that its Products provide a certain number of grams of protein, when in reality, they provide far fewer grams as alleged herein.

132.    Defendant knew or should have known that its protein representations were false and misleading.

133.   Defendants' deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

134.   Defendants' deceptive acts proximately caused actual injury and damage to Plaintiff and the Class members at the point of purchase.

135.   Plaintiff and Class members would not have purchased, or would have paid less for, Defendants' Products but for Defendants' material misrepresentations as described in this Complaint.  Defendant intended Plaintiff and all Class members to rely on their deceptive acts when purchasing Defendants' Products.

## PLAINTIFFS' SIXTH CAUSE OF ACTION
### Unjust Enrichment
### (Brought On Behalf of Plaintiffs and the 49-State Class)

136.   Plaintiffs reallege and incorporates by reference all paragraphs alleged herein

137.   Plaintiffs and members of the Class members conferred a benefit on the Defendants by purchasing the Products

138.   Defendants have been unjustly enriched in retaining the revenues from Plaintiffs' and Class Members' purchases of the Products, which retention is unjust and inequitable, because Defendants falsely represented that the Products contained and provided specific amounts of protein per serving, when, in fact, the Products contained approximately 17% less protein than represented, and provided even less. This harmed Plaintiffs and members of the class because they paid a price premium as a result.

139.   Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

140.   Plaintiffs, therefore, seeks an order requiring Defendants to make restitution to her and other members of the Class.

## PLAINTIFFS' SEVENTH CAUSE OF ACTION
### Common Law Fraud, Deceit and/or Misrepresentation
### (Brought On behalf of the 49-State Class)

141.   Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action

Complaint as if set forth herein.

142.    Defendants have fraudulently and deceptively informed Plaintiffs that the Products contain or provide more grams of protein than they actually contain or provide. Further, Defendants failed to list the DRV of protein, as it was required to do.

143.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiffs.  Therefore, Defendants owed Plaintiffs and class members a duty to disclose accurate facts regarding the Products. The misrepresentations and omissions were material to Plaintiffs and class members and Defendants intended Plaintiffs and consumers to rely on the misrepresentations and omissions.

144.    Defendants knew or should have known the composition of the Products, and knew or should have known that the Products did not contain or provide the amount of protein represented on the label. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendants' Products. Reasonable consumers would have been expected to rely on the misrepresentations and omissions, and Plaintiffs and Class members did in fact rely on the misrepresentations and omissions.

145.    Plaintiffs and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

146.    In misleading Plaintiffs and not so informing Plaintiffs, Defendants breached their duty to them. Defendants gained financially from, and as a result of, their breach.

147.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

148.    Plaintiffs and those similarly situated justifiably and reasonably relied on

Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

149.    As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

150.    Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendants as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial;

D.    An award of statutory damages in an amount to be determined at trial;

E.    An award of punitive damages in an amount to be determined at trial;

F.    An award of treble damages;

G.    An award of restitution in an amount to be determined at trial;

H.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.    For reasonable attorneys' fees and the costs of suit incurred; and

J.    For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 13, 2021                    **ANDERSON & KARRENBERG**

_/s/ Jason E. Greene_
Jason E. Greene, Esq.

-29-

1    50 West Broadway, Suite 700
     Salt Lake City, UT 84101

2    GUTRIDE SAFIER LLP
     SETH A. SAFIER (PHV forthcoming)
3    HAYLEY REYNOLDS (PHV forthcoming)
     100 Pine Street, Suite 1250
4    San Francisco, CA 94111
     Telephone: (415) 639-9090
5    Facsimile:  (415) 449-6469

6    MATT MCCRARY (PHV forthcoming)
     4450 Arapahoe Ave., Suite 100
7    Boulder, CO 80303

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint